UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRUCE E. STALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-30165-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
ORDER REVERSING OR REMANDING THE COMMISSIONER'S DECISION AND
DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 14 & 19)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

On September 9, 2014, Bruce Stall ("Plaintiff") filed a complaint pursuant to 42 U.S.C. §

405(g) against the Acting Commissioner of the Social Security Administration

("Commissioner"), appealing the denial of his claim for Social Security Disability Insurance

("SSDI").  Plaintiff asserts that the Commissioner's decision denying him such benefits -

memorialized in an April 9, 2013 decision by an administrative law judge ("ALJ") - was not

based on substantial evidence and was made in error.  The parties have filed cross-motions to

resolve Plaintiff's claim, respectively seeking an order reversing or remanding the

Commissioner's decision (Dkt. No. 14) and an order affirming the Commissioner's decision

(Dkt. No. 19).

The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will allow Plaintiff's motion and deny the Commissioner's motion.  The case will be remanded for further proceedings.

II.    PROCEDURAL BACKGROUND

On September 29, 2010, Plaintiff filed an application for SSDI, alleging a disability onset date of October 20, 2003 (Administrative Record ("A.R.") at 11).[1]  His application was denied initially on February 9, 2011 and on reconsideration in April 2011 (*id.*).  Plaintiff requested a hearing before an ALJ (*id.*).  That hearing was held on February 6, 2013 with Plaintiff, his representative, and an impartial vocational expert in attendance (*id.* at 23, 25).  At the time of the hearing, Plaintiff was 56 years old (*id.* at 28).  On April 9, 2013, the ALJ issued his decision, finding Plaintiff not disabled and denying Plaintiff's claim.  The Appeals Council denied Plaintiff's request for review (*id*. at 1-6).  The ALJ's decision thus became the final decision of the Commissioner.  This appeal followed.

III.    DISCUSSION

A. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  The court's review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000) (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  The court reviews questions of law *de novo*, but it must defer to the ALJ's findings of fact if they are supported by substantial evidence.  42 U.S.C. § 405(g) (citing *Nguyen*, 172 F.3d at 35).

---

[1] Plaintiff testified that he waited to apply for SSDI because up until 2010 he had been receiving workers' compensation benefits (A.R. at 47-48).

Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770. The ALJ's findings of fact, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen*, 172 F.3d at 35. Thus, if the ALJ made a legal or factual error, the court should reverse or remand such a decision to consider new material evidence or to apply the correct legal standard. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); 42 U.S.C. § 405(g).

   B. Entitlement to Social Security Disability Insurance

   In order to qualify for SSDI, a claimant must demonstrate that he was disabled within the meaning of the Social Security Act prior to the expiration of his insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). A claimant is disabled for purposes of SSDI if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The Commissioner must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*. at § 404.1520(a)(4); *see also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the Commissioner determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  *See* 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which is relied upon at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis.  At step five, the

Commissioner has the burden of showing the existence of other jobs in the national economy

that the claimant can nonetheless perform.  *Goodermote*, 690 F.2d at 7.

C. The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ applied the five-part analysis

required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since his alleged onset date of October 20, 2003, through December

31, 2014, the date on which he was last insured (*id.* at 13).  At steps two and three, the ALJ

found that Plaintiff had certain severe impairments - bilateral lower extremity radiculitis, left

greater than right, secondary to moderate left disc herniation at L5-S1 with neural foraminal

stenosis - but concluded that these impairments, taken separately or in combination, did not meet

or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (*id.*).  Before proceeding to step four, the ALJ found that Plaintiff had the RFC to

perform sedentary work as defined in 20 C.F.R. § 404.1567(a), including lifting ten pounds,

standing or walking for two hours, and sitting for six hours during an eight-hour workday, as

long as he had the options to sit and stand at will and to stretch and walk around a small

circumference (*id.* at 13).  The ALJ found that Plaintiff was further limited to a position that did

not require work at heights or around moving machinery, these restrictions serving as

preventative measures in regard to side effects from his medications (*id.*).  At step four, the ALJ

found that Plaintiff was unable to perform any past relevant work (*id.* at 17).  Finally, at step

five, considering Plaintiff's age, education, work experience, and RFC, and relying on the

testimony of the vocational expert, the ALJ determined that Plaintiff could perform jobs found in

significant numbers in the national economy, and, therefore, Plaintiff was not disabled (*id*. at 17-18).

     D. <u>Plaintiff's Contentions</u>

     Plaintiff argues that the ALJ's decision failed to make findings on "critical aspects" of Plaintiff's RFC, namely driving and mental limitations; that the ALJ did not explain in his credibility determination which symptoms he rejected and did not provide any reasons for his credibility determination; that the RFC failed to contain any analysis or findings on the period after Plaintiff turned 50 years old; and that for the period after Plaintiff turned 55 years old, there is sufficient evidence to support a finding that Plaintiff had no transferable skills and is therefore disabled (Dkt. No. 15 at 4 ).  Plaintiff seeks remand on all of these issues except the last, where he seeks reversal (*id.* at 8).  The Commissioner responds that substantial evidence supports the ALJ's RFC finding, that it is "obvious" from the record that the facts supporting his RFC assessment support his credibility determination as well, and that the ALJ properly found a significant number of jobs that Plaintiff could have performed prior to and subsequent to turning 50 years old (Dkt. No. 20 at 5-13).

     i. <u>Summary of relevant medical evidence</u>

     In August 2009, Plaintiff began treatment at BFS Hillcrest Family Health (A.R. 240, 252).  An MRI on August 19, 2009 revealed that Plaintiff had a moderate compromise of the left L5-S1 foramen due to disc protrusion and/or ostephyte formation (*id.* at 252).  Degenerative disc changes were noted at that level (*id.*).  Robert Davenport, M.D. ("Dr. Davenport") of Hillcrest Family Health noted that the "MRI from August of 2009 suggested there was significant nerve impingement at the L5-S1 level associated with disc protrusion and/or ostephyte formation" (A.R. at 284).

On January 8, 2010, Plaintiff saw Mark Pettus, M.D. ("Dr. Pettus") at Hillcrest Family Health who noted that for the previous five weeks Plaintiff had severe (10/10 with a baseline of 6/10) pain, radiating into his left leg and thigh with achiness and numbness throughout (*id.* at 240).  Plaintiff reported that "[a]ny activity and sitting/standing without being able to alternate frequently, is painful," and that oxycodone was "helping some" (*id.*).  At that time, Plaintiff was taking 7.5 milligrams ("mg") of Percocet (oxycodone) three times per day and 800 mg of prescription Motrin (ibuprofen) three times per day, in addition to other medications (*id.*).  On April 14, 2010 Plaintiff saw Andrew J. Demaggio, M.D. ("Dr. Demaggio") at the New England Pain Diagnostic & Treatment Center ("Pain Center") in Pittsfield for an initial evaluation and consultation (*id.* at 266).  Plaintiff complained of pain in his lower back radiating down the back of his left leg to the ankle (*id.*).  He described his pain as constant daily pain worsened by any activity and improved only with medications and rest and rated the severity of his pain at 5/10 to 10/10 (*id.*).  Dr. Demaggio noted that Plaintiff's "symptoms are likely related to moderate left lumbar disk herniation at the L5-S1 level." (*id.*).  On May 5, 2010, Plaintiff followed up with Glenda Boykin, PA-C at the Pain Center, where Plaintiff reported his pain level at 7/10, exacerbated by sitting, standing, walking, bending and lifting and improved to a small degree by medication and rest (*id.* at 262).  He further stated that due to his pain, he was only able to drive for ten to fifteen minutes before having to stop, get out of the vehicle, and walk to alleviate the pain (*id.*).  On May 12, 2010, Plaintiff saw Muhammad Gul, M.D. ("Dr. Gul") at Hillcrest Family Heath for a follow-up visit regarding his back pain (*id.* at 244).  At that time, Plaintiff's medications - gabapentin and oxycodone - made him more sleepy and drowsy (*id.*).  Dr. Gul provided Plaintiff with a letter stating that he was unable to work at that time because of back pain and was unable to drive because of heavy doses of gabapentin and oxycodone (*id.* at 245).

The May 12, 2010 letter stated that Plaintiff "is not medically cleared to return to work. Because of his condition he can only sit for 10-15 minutes and stand for 15-20 minutes. He is currently taking Oxycodone and Gabapentin both of which cause dizziness and sleepiness and therefore he should not be driving" (*id.* at 246). About one month later, on June 10, 2010, Plaintiff had an appointment at the Pain Center and rated his pain as a 6/10 in severity (*id.* at 259). Upon examination, Plaintiff was described as "well-developed, well-nourished" and in no acute distress with a "mildly antalgic" gait (*id.* at 259). On August 6, 2010, Dr. Gul at Hillcrest Family Health noted in his assessment that "[b]ecause of his lumbar radiculopathy[, Plaintiff] cannot work at this point in time [and] was given a letter stating this" (*id.* at 250). On September 29, 2010, Plaintiff saw Dr. Demaggio at the Pain Center and continued to complain of low back pain radiating in both lower extremities (*id.* at 256). He rated his pain at 8/10 and described "constant discomfort, which is worsened with standing, walking, and somewhat alleviated with oral medication and rest" (*id.*). Dr. Demaggio described him as "uncomfortable-appearing" in the examination room and with an antalgic gait, though stable to the left (*id.* at 256-257). In November 2010, Plaintiff's diagnoses were listed as "bilateral lower extremity radiculitis, left greater than right," "lumbar neural foraminal stenosis," and "moderate left lumbar disk herniation, L5-S1" (*id.* at 273). At that time, he rated his pain intensity at 7/10 and again described constant daily pain, worsened by standing, walking, bending and lifting (*id.*). Plaintiff reported some benefit with oral medication and rest (*id.*). Dr. Demaggio noted that Plaintiff's continued use of oxycodone and prescription ibuprofen appeared reasonable (*id.* at 274). On December 15, 2010, at an appointment at Hillcrest Family Health, Dr. Davenport noted that Plaintiff's pain needs were being met partially with Percocet, 7.5 mg tablets up to three times per day, and that sometimes Plaintiff broke one in half and dosed himself more frequently (*id.* at

284).  Dr. Davenport described Plaintiff as not in severe acute distress but complaining of low back discomfort and had limited range of motion of the lumbosacral spine (*id.* at 285).

In February 2011, Plaintiff saw Dr. Davenport to review his chronic pain condition and indicated that he continued to use Percocet three times a day, which lowered his pain from a "9 or 10 out of 10 level down to a 5/10 level of discomfort" (*id.* at 286).  Dr. Davenport noted that he was a "well-developed well-nourished middle-aged male who [was] in obvious discomfort sitting in the exam chair" with "an antalgic gait favoring his left leg" (*id.* at 287).  In his assessment, Dr. Davenport stated that "patient's symptoms match his radiographic findings on his MRI of 2009," and that he was "willing to fill out any kind of questionnaire in order to validate that he is unable to work in any capacity that requires prolonged sitting or prolonged standing and that he is unable to do any lifting because of his chronic pain condition from his low back" (*id.*).  In March 2011, Plaintiff indicated to Dr. Davenport that his back pain remained the same, but Percocet seemed to provide adequate relief along with the Zanaflex that Dr. Demaggio of the Pain Center had prescribed to him (*id.* at 288).  Examination notes from that appointment state that Plaintiff had "markedly restricted range of motion on forward flexion of his lower spine" (*id.* at 289).  On May 23, 2011, Plaintiff saw Dr. Memaggio and continued to report 7/10 in pain severity and that oxycodone, Zanaflex and prescription ibuprofen provided some benefit (*id.* at 310).  Dr. Demaggio recommended continued use of the medications, as well as "a left lumbar transforaminal epidural steroid injunction" and "a graduated cardiovascular and stretching program" (*id.* at 311).  In October 2011, Plaintiff continued to take 800 mg of ibuprofen three times a day and 7.5 mg of Percocet up to three times a day, and his low back pain was static (*id.* at 294).

On January 30, 2012, Plaintiff returned to Dr. Davenport complaining of continued back pain (*id.* at 324).  He stated that Percocet decreased the pain to about a "4-5/10 rather than a 7-10 level discomfort" (*id.*).  As of October 12, 2012, Plaintiff was taking 15 mg of oxycodone three times a day, which Dr. Davenport noted should be maintained (*id.* at 316-317).  Plaintiff reported that the oxycodone provided partial relief of his low back symptoms at that dose (*id.* at 315).  A second MRI of Plaintiff's lumbosacral spine was discussed, which showed "bulging discs and foraminal narrowing at the left L5-S1 region, which was most likely causing nerve impingement" (*id.*).  Dr. Davenport assessed Plaintiff as having ongoing lower back pain related to L5-S1 foraminal disease with bulging discs and ongoing sciatica (*id.* at 316).

ii.  The ALJ's credibility determination

Plaintiff argues that the ALJ failed to assess his credibility properly in that that the ALJ failed to specify which symptoms he rejected, in whole or in part, and failed to give reasons for rejecting those symptoms (Dkt. No. 15 at 4).  The Commissioner argues that it is "obvious" that the facts supporting the ALJ's RFC assessment also supported the ALJ's credibility determination (Dkt. No. 20 at 10).  In the court's view, Plaintiff has the stronger argument.

In assessing a claimant's complaints of pain, an ALJ must first find that the claimant's impairments, as demonstrated by "medical signs and laboratory findings," "could reasonably be expected to produce the symptoms."  Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1 (July 2, 1996).  If the claimant meets that threshold, as the ALJ found Plaintiff did in this case, the ALJ should consider whether "the intensity, persistence, and functionally limiting effects" of the pain would affect the claimant's ability to work.  *Id.*  This step requires an assessment of the credibility of the claimant's statements regarding his or her symptoms and their functional effects.  *Id.*; *see* 20 C.F.R. § 404.1529(c)(1).  Accordingly, the First Circuit has

explained that in the case of subjective claims of pain, an ALJ must inquire into six factors at an individual's hearing and consider them in the resulting decision. *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986); *see Nguyen*, 172 F.3d at 34; *Lopes v. Barnhart*, 372 F. Supp. 2d 185, 191-192 (D. Mass. 2005); *see also* 20 C.F.R. § 404.1529(c)(3). Those factors are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) daily activities. *Avery*, 797 F.2d at 29; *see* SSR 96-7p, 1996 WL 374186, at *1 ("In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, . . . the adjudicator must consider [the *Avery* factors] in addition to the objective medical evidence when assessing the credibility of an individual's statements."). "The ALJ must then take into account any evidence relating to these six areas in judging the credibility of a claimant's subjective claims of pain, specifying his or her reasons for disbelieving any of those complaints." *Pires v. Astrue*, 553 F. Supp. 2d 15, 23 (D. Mass. 2008).

Here, the ALJ found that Plaintiff's "medically determined impairment could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely credible for the reasons explained in [his] decision" (A.R. at 15). As best the court can determine, in stating that Plaintiff was not credible for the reasons explained in the decision, the ALJ was referring to his recitation of certain medical evidence regarding Plaintiff's physical symptoms and subjective complaints of pain (A.R. at 13-16). That recitation of evidence, however, contains no

11

explanation of why the ALJ did not fully credit Plaintiff, and it is far from "obvious," as the

Commissioner suggests, that Plaintiff should have been found less than completely credible.  *See*

*McClain v Colvin*, No. CA 13-768L, 2015 WL 410652, at \*6 (D.R.I. Jan. 29, 2015) ("Where an

ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and

adequate reasons for doing so, or the record must be obvious as to the credibility finding."); SSR

96-7p, 1996 WL 374186, at \*1 (The ALJ's decision "must contain specific reasons for the

finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight.").  Here, "[w]hat

is missing from [the] analysis is any explanation as to why [P]laintiff's subjective complaints

were found less than fully credible."  *Norman v. Astrue*, 912 F. Supp. 2d 33, 44 (S.D.N.Y. 2012)

(internal quotation marks omitted).

Moreover, although the Commissioner argues that the ALJ's "decision contained a

detailed discussion of the record evidence that was inconsistent with the plaintiff's complaints of

disabling pain," (Dkt. No. 20 at 9), no such discussion exists.  There is no finding as to any

inconsistency between the record evidence and Plaintiff's complaints.  If the Commissioner is

suggesting that the ALJ's recitation of objective medical evidence constitutes a rejection of

Plaintiff's statements about the intensity, persistence, and limiting effects of his pain, that would

be legal error.  Social Security Ruling 96-7p states that reliance on objective medical evidence

alone in judging credibility is not appropriate:

> Because symptoms, such as pain, sometimes suggest a greater
> severity of impairment than can be shown by objective medical
> evidence alone, the adjudicator must carefully consider the
> individual's statements . . . . [Complaints regarding pain and its
> functional effects] may not be disregarded solely because they are
> not substantiated by objective medical evidence.

12

SSR 96-7p, 1996 WL 374186, at *1; *see Valiquette v. Astrue*, 498 F. Supp. 2d 424, 433 (D.

Mass. 2007) ("[S]ome dissonance between the objective medical assessments and the plaintiff's

description of the level of pain he was experiencing . . . merely poses the question of the

credibility of this subjective complaints, it does not answer it."); *Pires*, 553 F. Supp. 2d at 23 (the

ALJ may not reject evidence elicited during the *Avery* inquiry solely based on inconsistency with

objective medical evidence); 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements

about the intensity and persistence of your pain . . . solely because the available objective

medical evidence does not substantiate your statements.").   Accordingly, this would not be a

legally sufficient basis to support the ALJ's credibility determination.

Over the course of about three years, Plaintiff consistently rated the severity of his pain as

being from about 5 to 8 out of 10 with medication, which helped in part, and from about 8 to 10

out of 10 without medication.  In a November 2010 pain questionnaire, Plaintiff stated that

medication takes his pain from a 9-10 to a 6-8 level (A.R. at 177).  He also repeatedly described

his pain as aggravated by walking, sitting, bending, and lifting.  At the hearing, Plaintiff testified

that his pain, which he rated at 6 to 8 out of 10 in severity with medication and 8 to 10 without,

occurred on a daily basis (A.R. at 37).  He further testified that he engaged in minimal daily

activities, that driving and doing chores posed difficulties, that his severe pain was only partially

alleviated by pain medication, and that most positions, including sitting and standing, caused him

pain (A.R. at 37-45).  *See Pires*, 553 F. Supp. 2d at 24.  Dr. Demaggio described Plaintiff's

medication use as reasonable, and there is no evidence of any medical provider suggesting drug

seeking behavior on the part of Plaintiff or skepticism regarding his reports of pain.  *See id.*

("none of the physicians assessing [claimant's] level of impairment expressed skepticism

regarding her claims of disability").  Given the consistency of Plaintiff's reports regarding his

pain and his limitations and the lack of evidence contradicting those reports, such as, for

example, reports of daily activities inconsistent with disabling pain, the court cannot conclude

that the ALJ's credibility determination was supported by substantial evidence.  Nor did the

credibility determination reflect the necessary specific findings pointing to the evidence on

which he relied as a basis for disbelieving Plaintiff.  *See Da Rosa v. Sec'y of Health & Human

Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986) (remanding credibility decision to ALJ and stating that

any new credibility finding "must be supported by substantial evidence and the ALJ must make

specific findings as to the relevant evidence he considered in determining to disbelieve the

appellant"); *Pires*, 553 F. Supp. 2d at 24 ("Given this set of facts, it is difficult to determine on

what reasonable basis the ALJ could have found [claimant's] testimony not to be credible if he

were truly taking into account evidence besides the objective findings of Plaintiff's physical

exams and medical scans."); *Guyton v. Apfel*, 20 F. Supp. 2d 156, 166 (D. Mass. 1998) ("[A]

general reference to the record stating that 'Claimant's testimony regarding pain and discomfort

is not credible to the extent alleged in light of the evidence of record' . . .  does not satisfy the

requirement of specific findings for credibility determinations.").

     In addition, it appears that the ALJ did not consider the *Avery* factors in his decision, as

required by the First Circuit, and"[t]he consistency of the evidence in support of [Plaintiff's]

subjective claims of pain . . . casts doubt on any assumption that the ALJ [ ] implicitly

consider[ed] the Avery factors and construed them to support his conclusion."  *Pires*, 553 F.

Supp. 2d at 24.  Of particular relevance here is the factor regarding the type, dosage,

effectiveness, and side effects of Plaintiff's pain medication.  The ALJ addressed this factor

summarily during the hearing, but his colloquy was insufficient.  Plaintiff testified to the amount

of medication he was taking, which included 15 mg of Percocet three times per day; 800 mg of

prescription ibuprofen three times per day; 200 mg of Lyrica three times per day; and tiznodine,

a muscle relaxer, every night to alleviate difficulty in sleeping (A.R. at 34-35).  The ALJ did not

make any inquiry about that regime other than to ask Plaintiff to explain what he meant by his

previous statement that Percocet provided him "adequate relief" (A.R. 46-47).[2]  Other than the

answer Plaintiff provided, the ALJ failed to further inquire as to the effectiveness of the

medications.  Also during the hearing, Plaintiff's representative asked Plaintiff whether there

were any side effects to these medications, to which Plaintiff responded that he became "higher

than a kite," got "dizzy," "spacey," and "[could not] concentrate," and that his "coordination

[was] off." (A.R. 35, 46).  At no point did the ALJ ask what Plaintiff meant by these terms and to

what extent his ability to concentrate was impaired or his coordination affected.  *See Musto*, 135

F. Supp. 2d at 230 ("[T]he administrative law judge did not follow up on what Musto meant

when he said that his medication makes him 'stupid.'").  Thus, the ALJ did not adequately

develop the record during the hearing as to type, dosage, effectiveness, and side effects of

---

[2] Q: Sir, in March of 2011 I'm looking at a doctor's note. . . . And it says that you state that
Percocet seem[s] to provide adequate relief along with Zanoflex.  What do you regard as
adequate?
A: It helps with the pain.
Q: Well, but what does adequate mean? Adequate to do what?
A: When I'm – the sciatic and the stabbing is going on I take the pill and it helps with the pain.
Q: What things are you able to do with the pill that you couldn't do without it?
A: I really don't understand what you're asking, sir.
Q: Well, the doctor seems to be quoting you saying that the relief is adequate so I'm trying to
elicit from - -
A: It's adequate - -
Q: - - what adequate means.
A: -- because I don't want anything stronger.  I don't want - - I'm a walking zombie most of the
time now and I don't want more medication to be dumped in me.
(A.R. at 46-47).

Plaintiff's medication to support his determination that Plaintiff's complaints of pain were not wholly credible.  *See Musto*, 135 F. Supp. 2d at 230-231.

It is well-established that each *Avery* factor must be discussed in the ALJ's decision. Here, the decision does not contain any clear discussion of any of the six factors.  In cases where a court has stated that an ALJ need not discuss every enumerated *Avery* factor, the evidence plainly supported the ALJ's determination.  *See Pires*, 553 F. Supp. 2d at 24 (discussing cases). That is not the case here.  *Cf.  Balaguer v. Astrue*, 880 F. Supp. 2d 258, 269 (D. Mass. 2012) (not requiring each *Avery* factor be addressed where hearing officer found claimant's reported activities were inconsistent with her alleged symptoms, that the claimant was non-compliant with her medical treatments, and that she was not credible as to her reported limitations in her daily activities); *Mascia v. Astrue*, No. 08-40105-TSH, 2013 WL 1285548, at *9 (D. Mass. Mar. 25, 2013) (holding that "the ALJ could have provided greater detail with respect to the *Avery* factors, but his decision both as to the claimant's credibility and his ultimate conclusion that claimant is not disabled are substantially supported by the record," which included a doctor's note that while claimant's chronic back pain interfered with his day to day activities, he was able to walk three miles a day).  Accordingly, the ALJ erred in not addressing each of the *Avery* factors as a basis for his decision to discount Plaintiff's subjective complaints of disabling pain.  *Avery*, 797 F.2d at 29.

In sum, the court finds that the ALJ erred as a matter of law in failing to provide an explanation for why he did not believe Plaintiff, provide specific findings justifying that disbelief, and addressing the *Avery* factors in his credibility determination.  On this record, the court cannot conclude that the credibility determination was supported by substantial evidence. Plaintiff is entitled to a remand on this basis.

ii. <u>Other Arguments</u>

Plaintiff asserts two other arguments in his motion for judgment on the pleadings. Because the court will remand the case for proper consideration of Plaintiff's subjective claims of pain, the court will address his two remaining arguments only briefly.  First, Plaintiff asserts that the ALJ failed to include or, at a minimum, address his inability to drive and his problems with memory, concentration, and attention in the RFC analysis and improperly relied on flawed testimony from the vocational expert because the hypothetical to the expert failed to include mental limitations or an inability to drive.  To the extent Plaintiff argues that these limitations result from his pain or are side effects from his pain medications, the claim is persuasive. Plaintiff's credibility with respect to his subjective claims of pain is at issue, and the ALJ failed to develop the record sufficiently with respect to side effects from Plaintiff's medications.

Plaintiff further argues that the ALJ failed to make necessary findings as to the transferability of skills he acquired from his previous work, particularly for the periods when he was approaching advanced age and was of advanced age (Dkt. No. 15 at 5-8).[3]  "In order to be substantial evidence . . . the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations."  *Sousa v. Astrue*, 783 F. Supp. 2d 226, 235 (D. Mass. 2011) (citing *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982)); *see Musto*, 135 F. Supp. 2d at 232.  Here, the hypotheticals presented to the vocational expert were "inadequate because, as discussed above, the [ALJ] failed to explore sufficiently whether [Plaintiff's] medications impeded [his] ability to concentrate," *Wells v.*

---

[3] Social Security Ruling 82-41 defines a skill, in part, as "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of the occupation which is above the unskilled level (required more than 30 days to learn)."  SSR 82-41, 1982 WL 31389, at *2 (1982). "Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs."  *Id.*

*Barnhart*, 267 F. Supp. 2d 138, 148 (D. Mass. 2003), and Plaintiff's statements of pain were not found credible.  Consequently, the vocational expert's testimony was "based on a lack of information that may have been unjustified."  *Id*.  When the ALJ asked the vocational expert whether any position could accommodate a hypothetical individual being "off task 15 percent of the time or more" "due to pain and the side effects of medication for pain," the vocational expert responded that such an individual would not be able to perform any work in the labor market (A.R. at 55).[4]

With respect to decisions involving transferability of a claimant's skills, SSR 82-41 provides: "When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision."  SSR 82-41, 1982 WL 31389, at *7 (1982).  "Transferability of skills is an issue only when an individual's impairment(s), though severe, does not meet or equal the criteria in the Listing of Impairments in Appendix 1 of the regulations but does prevent the performance of past relevant work (PRW), and that work has been determined to be skilled or semiskilled."  *Id.* at *1. Because the ALJ found that Plaintiff's impairments were severe but did not meet or equal the Listing of Impairments, and because Plaintiff was prevented from performing his past relevant, skilled work as a salesperson, the transferability of his skills was at issue.

Transferability of skills, however, "will be decisive in the conclusion of 'disabled' or 'not disabled' in only a relatively few instances because, even if it is determined that there are no transferable skills, a finding of 'not disabled' may be based on the ability to do unskilled work." SSR 82-41, 1982 WL 31389, at *1; *see, e.g.*, *Scarafone v. Colvin*, 2015 WL 71490, at *5 (D.

---

[4] Also, when asked if the hypothetical individual "were either late arriving for work or leaving before the ordinarily schedule[d] quitting time, or be totally absent, with one or the other of these things occurring at least three times a month," the vocational expert answered that that would not be acceptable to any employer (*id.*).

Mass.  Jan. 6, 2015) (vocational expert's finding that claimant was able to perform unskilled jobs

that did not require skills acquired in the claimant's past relevant work rendered any alleged

error by the expert in determining transferable skills harmless error).  It appears that the ALJ was

relying on this provision in finding that, "[t]ransferability of job skills [was] not material to the

determination of [Plaintiff's] disability because using the Medical-Vocational Rules as a

framework support[ed] a finding that [Plaintiff was] 'not disabled,' whether or not [he had]

transferable job skills" (A.R. at 17) (citing SSR 82-41 and 20 C.F.R. Part 404, Subpart P,

Appendix 2).  The ALJ's finding is not in accordance with the vocational expert's hearing

testimony and the provisions of SSR 82-41.

  During the hearing, the vocational expert opined that Plaintiff's past work in sales would

generate transferable skills to sedentary work, including maintaining records, interacting with the

public, and persuading others, as well as "the ability to make judgments and decisions that would

be appropriate [in] doing fairly complex work tasks" (A.R. at 50).  Taking Plaintiff's specific

profile into consideration, the vocational expert then found that Plaintiff could perform the jobs

of claims clerk (DOT No. 205.367-018), information clerk (DOT No. 237.367-022), and

receptionist (DOT No. 237.367-038), which are all "sedentary, semi-skilled positions" rated at a

specific vocational preparation or "SVP" of 4 (A.R. 53-54).  *See* SSR 00-04p, 2000 WL

1898704, at *3 ("semi-skilled work corresponds to an SVP of 3-4"); 20 C.F.R. § 404.1568(d)(1)

(a claimant is considered "to have skills that can be used in other jobs, when the skilled or semi-

skilled work activities [he or she] did in past work can be used to meet the requirements of

skilled or semi-skilled work activities of other jobs or kinds of work"); *see also Carle v.*

*Barnhart*, No. 05-71-B-W, 2005 WL 3263938, at *3 (D. Me. Nov. 30, 2005) ("An individual is

able to perform semi-skilled work only if [he] has transferable skills"), report and

recommendation approved, No. 05-71-B-W, 2005 WL 3488281 (D. Me. Dec. 20, 2005).  The

vocational expert did not limit Plaintiff to unskilled work.  Therefore, it appears that the ALJ

erred in finding the transferability of Plaintiff's skills immaterial in this case, when the

vocational expert, on whose testimony the ALJ relied, testified to the availability of semi-skilled

work.  In addition, the ALJ failed to account for the effect of Plaintiff's claimed limitations on

his transferable skills.[5]  Accordingly, remand is warranted on the availability of suitable work in

the national economy.  *See Seavey*, 276 F.3d at 12 ("When an agency . . . has provided

insufficient explanation for its action, the reviewing court ordinarily should remand the case to

the agency.").

    IV.    <u>Conclusion</u>

    For the reasons stated above, Plaintiff's motion for judgment on the pleadings (Docket

No. 14) is GRANTED, and the Commissioner's motion for an order affirming the decision

(Docket No. 19) is DENIED.  The case is remanded for further proceedings pursuant to sentence

four of 42 U.S.C. § 405(g).

    It is so ordered.

        /s/ Katherine A. Robertson
        KATHERINE A. ROBERTSON
DATED: September 21, 2015    United States Magistrate Judge

---

[5] The ALJ also told the vocational expert that he should consider a person between the ages of 47 and 49 for purposes of his testimony, and that he would "make any adjustments necessary for the effective medial/vocational guidelines at ages 50 and 55 during deliberation" (A.R. at 50).  Thus, the ALJ appeared to recognize that an analysis pertaining to certain ages might be necessary based on the Medical-Vocational Guidelines, but he again failed to explain or make any findings on that point in his decision.  *See* 20 C.F.R. §§ 404.1568(d)(2)(how we determine  skills that can be transferred to other jobs), (d)(3)(degrees of transferability), d(4)(transferability of skills for persons of advanced age).